OPINION
Appellant Armina Tackett, mother of Jacob Hauserman (d.o.b. 6/18/93), appeals from the order of the Juvenile Court granting Cuyahoga County Department of Children and Family Services ("Family Services") permanent custody of Jacob. Appellant contends the evidence was not sufficient to warrant a transfer of permanent custody to Family Services. We find no error and affirm.
On Jacob's third birthday, June 18, 1995, while unattended, he fell from a second story porch and sustained severe injuries to his brain and trachea. He was placed in Heather Hill Rehabilitation Hospital. Emergency custody of Jacob was given to Family Services on December 1, 1995. On January 17, 1996, temporary custody was given to Family Services. On May 30, 1997, Family Services filed a motion to modify temporary custody to permanent custody. A hearing on permanent custody was conducted on November 5, 1998 and the following evidence was presented.
Officer Harper testified to an incident that occurred ten days before the hearing involving Jacob's siblings. He stated that on October 26, 1998 at 11:40 a.m. he was dispatched to the appellant's street as two small children were seen walking in the street unattended. He was then instructed that the children were sitting in front of a house on that street. When he arrived at the home twenty minutes later, he saw the two children who were two and three years old sitting on the porch. The children were inadequately dressed for cool weather with one only wearing a t-shirt and a diaper and no shoes and the other wearing only shorts with no shirt or shoes. Inside the home the officer found a ten-year-old boy asleep on the couch with his coat on. About a half hour later, another boy who was about eight years old arrived at the home. The officer described the living conditions as "deplorable," with no stove or refrigerator and no food to be found anywhere. The entire home was roach infested and there was garbage outside the house. Also, in spite of the cold, the kitchen window was wide open. The officer described the children as looking unkempt.
The officer stated that the mother came home about five minutes after he arrived. She told him she was at a neighbor's house using the phone to check on her baby who was in the hospital and to try to contact the children's father so that he could babysit while she went to the hospital. She also told the officer that she had just moved there from another county and that she used the kitchen of the downstairs resident. The officer notified kid's hotline about the situation and Regina Burton of Family Services arrived on the scene. Burton then determined that the children needed to be taken to the agency and processed for emergency custody. He stated the two younger children did not have shoes to wear to the agency and the older child did not have a shirt but wore a coat. The officer stated that the children appeared happy to leave the home and were primarily concerned with being fed. The officer recalled that the mother had been smoking.
Regina Burton from Family Services confirmed the officer's testimony. She described the children as dirty and noted there was no food in the house and inadequate sleeping facilities. She looked in the neighbor's refrigerator downstairs that the mother claimed to share, and found only moldy food and an unrecognizable bag of meat. In processing the children at the agency, she discovered that the oldest boy, William, was not in school because he was in need of asthma medication, and since the mother did not have the money to buy it, he could not go to school. The appellant did not make efforts to raise the money or inquire whether any special allowances could be made so that his medication could be filled.
Michelle Lee, the family's social worker since March 1997, testified at the hearing that on December 1, 1995, Family Services was granted temporary custody of Jacob and his four other brothers. On January 17, 1998, the children were adjudicated as neglected and dependent. As a result of that adjudication, Jacob was committed to the temporary custody of Family Services while his siblings were committed to the protective supervision of Family Services with the parents retaining custody. While Jacob continued in temporary custody, custody of his brothers was modified to their maternal aunt, Brenda Haynack, on October 28, 1997. Sometime after this, the appellant moved to Piketon, Ohio, four and one-half hours away. Lee stated that the aunt ended up not being able to care for the boys and called the agency asking them to take the children away. Sometime in March 1998, the aunt gave appellant custody of the boys who brought them back to Piketon with her.
Lee stated that during the summer of 1998, she received a call from the appellant stating that she was in Cleveland because her father was ill. The appellant did not inform Lee that she had moved her permanent residence to Cleveland. Lee testified that in spite of the appellant having custody of Jacob's siblings, that the agency moved for permanent custody of Jacob since the appellant had failed to complete the medical training for the care of Jacob. Despite the fact that since moving for permanent custody, the appellant has completed the educational portion of the medical training and done exceptionally well, Lee stated that the agency was still pursuing the permanent custody based on the appellant's failure to complete the hands-on training portion of the medical training which would indicate whether the appellant could handle the long term care of Jacob. The agency was also pursuing permanent custody based on what happened with the other children on October 26, 1998. She stated that if the mother could not provide the basic needs for the other children, that she would not be able to take care of a special needs child like Jacob. She pointed out that although the appellant had completed the educational part of the medical training, that it took her two years to do so. Lee admitted that she believes that the appellant loves and is genuinely concerned about her children.
Lee stated that Jacob has been in a foster home which specializes in medical needs of children for about two years. She stated that Jacob cannot be away from the house for more than one hour because his portable mist machine only lasts one hour. While the mother was living in Piketon, Lee set up visitations in Ashland. She stated that the mother made one of these visits and Lee's attempt to set up other visitation times was difficult because the mother's telephone was disconnected and other times the mother just did not show up.
Regarding Jacob's biological father, Lee stated that she had not heard from him since October 1997; that the father had completed the medical training for Jacob, but had not taken the alcohol/drug assessment test.
Loretta Geyer, a Health Hill Hospital social worker specializing in foster care for medically fragile children, testified that she is the caseworker at the hospital for Jacob Hauserman. She explained that along with the tracheotomy Jacob has a traumatic brain injury which makes him impulsive which requires that he be supervised closely. He cannot participate in contact sports or rough play, due to the risk of another head injury. He has great difficulty filtering out stimulation, which compounds his behavioral problems. He also is developmentally delayed and has asthma.
Geyer admitted that in July 1997 the mother called her to inquire about completing her medical training. At that time, Geyer told the mother that Jacob might be decannulated in August and that if that happened she would not have to be trained for the trachea care and to wait until after the surgery. Geyer did not hear from the mother again until April 1998 when the mother told her that there were pending court hearings and that she wanted to get things in order and wanted to complete her training. The first week of July 1998 appellant completed the educational part of her medical training but to date, has not completed the remainder of the necessary training.
Mary Flood, Jacob's nurse at Health Hill Hospital, testified that Jacob needs close supervision. She stated that his foster family receives nursing assistance eight hours per day to aid them in their care of Jacob. One care giver still has to be present when the nurse is there, but she stated the assistance relieves the care giver from having to supervise Jacob visually twenty-four hours a day. Flood stated that Jacob cannot tolerate any stimulation while he is eating and needs to eat in a quiet environment. He also needs a smoke-free environment due to his respiratory problems. Flood stressed that Jacob has an opening for his trachea tubing and that he cannot be exposed to a home environment where there is a risk of infection. She also explained that cockroaches are the highest cause of asthmatic reactions in children. Flood admitted that Jacob was happy to see his mother when she visited at the hospital.
Jacob's maternal aunt, Brenda Haynack, testified that she had legal custody of four of the children for several months. She said she voluntarily gave the children back to their mother when it seemed like she had her life together in Piketon, Ohio. She also stated that she gave the children to appellant because of injuries she sustained in an automobile accident she could not handle the children. She stated that she was presently ready to help her sister and stated that there were other family members who were also prepared to help with the other children. Brenda had finished all of the training regarding Jacob except for the last medical training class because Michelle Lee told her that there was no way she was going to get Jacob and ended the training. The aunt accompanied the mother several times to visit Jacob in Ashland. The aunt testified to the strong bond between Jacob and his mother and siblings but admitted she had not seen Jacob in two years. Brenda testified that her sister is currently living in a one-bedroom apartment with their aunt.
Appellant testified that she had only been at the current home for about two and one-half weeks when the children were removed on October 26th. She stated that she moved because of problems her landlord was having with the housing inspector. She returned to Cleveland because her father was dying. He passed away on October 16, 1998. While she lived in Piketon, she said a social worker from Pike County inspected the home where she and the children were living and found it to be suitable. She has completed her parenting classes, drug and alcohol assessment and psychological assessment. She stated that she started the medical training for Jacob in 1996 when he was first admitted to Health Hill Hospital and underwent about three months of training with sessions two to three times per week. She stated that the training was stopped so that Jacob's foster parents could be trained. According to appellant she attempted to get the training resumed, since it was always an issue at the court hearings she attended, however, she could not get anyone to respond. She agreed that she needed to do the hands-on training in order to determine if she could indeed handle Jacob along with all of her other responsibilities. She admitted that she had not seen much of Jacob in the last two years, but claimed it was because the agency was not arranging the visitation appropriately. She said there were several times she came to the Metzenbaum Center for her scheduled Friday visits and Jacob would not be there. Appellant admitted that she still smoked, but stated that once Jacob was ready to come home that she would quit.
The appellant admitted that the house she was living in when Jacob's siblings were taken away was not suitable housing, but that it was the only place she could find at the time. She explained that once her father's estate was probated she would have funds to find a decent home for the children.
Ms. Annadale, Jacob's guardian ad litem, recommended that it was in Jacob's best interest that permanent custody be granted to the agency. She explained that Jacob had considerable medical needs and that she believed that the mother was unable to cope with his needs. She stated that she doubted that she could even attend to his daily needs given she could not provide for her other children.
On November 24, 1998, the trial court granted permanent custody of Jacob to Family Services.
We will address appellant's assignments of error in the order presented.
 I. NO CREDIBLE EVIDENCE ON RECORD SUPPORTS THE JUVENILE COURT'S FINDING THAT MS. TACKETT HAS DEMONSTRATED A "LACK OF COMMITMENT" TO HER CHILD BY FAILING TO REGULARLY SUPPORT HIM WHEN ABLE TO DO SO.
R.C. 2151.41.4 (E) states that if the Juvenile Court finds by clear and convincing evidence that one or more of the statutory factors enumerated in R.C. 2151.41.4 (E) exists "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." Once the court has properly determined that one of the enumerated factors exist, it is mandated to enter a finding that the child cannot or should not be placed with either of his parents within a reasonable period of time. In re ShanequaH. (1996), 109 Ohio App.3d 142.
 "Clear and convincing evidence" as required by this statute is defined as "that measure or degree of proof which is more than a mere `preponderance of evidence' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."
In re Awkal (1994), 95 Ohio App.3d 309, citing, Lansdowne v.Beacon Journal Publishing Co. (1987), 32 Ohio St.3d 176, 180-181.
In the case herein, the trial court found that Family Services should receive permanent custody based on:
 Mother and father have demonstrated lack of commitment toward the child by failing to regularly support the child when able to do so. Mother and alleged father have shown an unwillingness to provide an adequate permanent home for the child.
This is one of the findings listed in R.C. 2151.41.4 (E) as justifying the grant of permanent custody. See R.C. 2151.41.4 (E) (4). Appellant claims the evidence did not support these findings by the trial court.
The deference we must show the trial court's findings and determination was set forth by this Court in In re Awkal, supra,
at 316 as follows:
 R.C. 2151.41.4 (D) is written broadly and requires the juvenile court judge to consider all factors that are relevant to the best interests of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as whether to terminate parental rights, privileges and responsibilities. The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record. See Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410-411, N.E.2d 1273, 1276; cf. Miller v. Miller (1988), 37 Ohio St.3d 71, 523 N.E.2d 846. Hence, this reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious. See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142 (defining "abuse of discretion").
The trial court's decision in the instant case was not arbitrary, unreasonable or capricious. The evidence supported the trial court's finding that Jacob's parents "demonstrated a lack of commitment toward the child by failing to regularly support the child when able to do so." Testimony at the hearing was that the appellant moved four and one-half hours away from Jacob during a time he was undergoing crucial surgery. It appears that while she lived in Piketon, things were apparently going well for her, yet she did not attempt to pursue efforts to visit Jacob regularly or regain custody. In fact, she only saw Jacob one time while she lived in Piketon. Although her medical training was temporarily stopped in July 1997 due to the impending surgery, she did not inquire until eight months later about when her training could again begin. Although Jacob's father appeared initially to be interested in taking part in his son's life, he has not been heard from since October 1997.
The professionals involved with the mother also testified that appellant was unable to provide permanent housing for the basic needs of her healthy children, let alone Jacob. A mere ten days before the hearing before the trial court, the defendant's four other children were taken from her care and placed temporarily with the agency due to the deplorable conditions they were living in. The children lived in a filthy roach-infested house with no food and barely any clothing. The two youngest children, ages two and three, were also seen roaming the street unattended. Although the mother attempted to make excuses for this situation, one cannot help but wonder why she did not seek the support of her family network that she contended existed at the time of the hearing. Also, although we recognize that the mother no longer lives at that home, she currently lives in a one-bedroom apartment with her aunt, which is hardly sufficient permanent housing for a child who requires his own space to prevent excess stimulation.
Ample evidence was presented to support the court's decision and we find no basis for disturbing the trial court's discretion based on the record.
Assignment of Error I is overruled.
 II. NO CREDIBLE EVIDENCE ON RECORD SUPPORTS THE JUVENILE COURT'S FINDING THAT THE CUYAHOGA DEPARTMENT OF CHILDREN AND FAMILY SERVICES MADE "REASONABLE EFFORTS" TO ENABLE JACOB HAUSERMAN TO RETURN HOME.
In order to enable her to provide appropriate care for her children, Family Services required appellant to complete a parenting education class, to attend counseling to address domestic violence, an alcohol abuse treatment program, a psychological evaluation, and a drug abuse treatment program. All necessary referrals were made and appellant completed these programs. Further, she was provided with in-home family preservation services to assist her in meeting her children's basic needs. However, appellant failed to benefit from these services, as demonstrated by the October 26, 1999 removal of Jacob's siblings.
Appellant asserts that she was not offered enough opportunities to attend training to meet Jacob's special needs. Beyond the fact that this argument is moot because she could not even meet the basic needs of her other children, it was appellant who made herself unavailable for the portion of the training which would have allowed her to spend time as his primary caregiver over increasingly long periods of time. Had appellant not moved four and one-half hours away, efforts to coordinate the training could have been much more effective.
Appellant further asserts that Family Services made no attempts to assist her in finding suitable housing after she returned to Cleveland. However, she never notified her social worker that she was permanently relocating to Cleveland.
Appellant also focuses on the fact that the journal entry does not "briefly describe" the services offered to her. However, these efforts are readily apparent from the record and the court's failure to briefly describe these efforts does not constitute reversible error. As stated in In re Pieper Children
(1993), 85 Ohio App.3d 318, 325-326:
 R.C. 2151.41.9 requires the court to find that the agency filing the complaint for custody "has made reasonable efforts * * * to eliminate the continued removal of the child from his home, or to make it possible for the child to return home." The statute also requires the court to make written findings of fact describing the relevant services rendered by the agency and why they were inadequate to reunite the family. In its adjudicatory entry, the trial court made no express findings contemplated by the statute. However, the ultimate issue is the reasonableness of the agency's efforts, and that may be determined from the record.
Assignment of Error II is overruled.
 III. THE COURT'S FINDING THAT JACOB HAUSERMAN'S BEST INTERESTS WERE SERVED BY SEVERING HIS RELATIONSHIP WITH HIS MOTHER IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE IN THE RECORD.
The court may grant permanent custody if it determines by clear and convincing evidence in accordance with R.C. 2151.41.4 (E) that the child cannot be placed with either parent within a reasonable time, or should not be placed with either parent and it determines in accordance with R.C. 2151.41.4 (D) that the permanent commitment is in the best interests of the child. In reVinci (Sept. 3, 1998), Cuyahoga App. No. 73043, unreported at 7. R.C. 2151.41.4 (D) provides the following considerations the trial court must consider in determining if permanent custody to family services is in the best interests of the child:
 (D) In determining the best interest of a child at a hearing held pursuant to division (A) (4) or (5) of section 2151.35.3 92151.35.3] for division (C) of this section 2151.41.5 [2151.41.5] of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition issued under section 2151.35.3 [2151.35.3] of the Revised Code for twelve or more months of a consecutive 22 month period ending on are after the effective date of this amendment.
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in division (E) (7) to (12) of this section apply in relation to the parents and child.
Only one of these factors needs to be resolved in favor of the award of permanent custody. In re Shaeffer Children (1993),85 Ohio App.3d 683, 692.
In the case herein, the evidence established that Jacob has been, pursuant to R.C. 2151.35.3, [2151.35.3], in temporary care of Family Services since January 17, 1996. By the time of the hearing on November 5, 1998, he had been in consecutive care of Family Services for fifteen months since the enactment of R.C. 2151.41.4 [2151.41.4] (N.E. No. 274, effective August 8, 1996). Therefore, pursuant to R.C. 2151.41.4 (D) (3), Jacob's custodial history indicates the need for Family Services to have permanent custody. Also, the alternative in extending the foster care until the appellant can finish her medical training and find suitable housing is not available pursuant to R.C. 2151.35.3 (F), which states:
 Any temporary custody order issued pursuant to division (A) of this section shall terminate one year after the earlier of the date on which the complaint in the case was filed or the child was first placed in shelter care, except that, upon filing of a motion pursuant to section 2151.41.5 of the Revised Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order under that section.
The exceptions under R.C. 2151.41.5 simply do not apply here. In order to obtain an extension the agency must file a motion for an extension and there must be clear and convincing evidence that:
 the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension.
R.C. 2151.41.4 (D) (1). We simply do not have such evidence here.
It was shown that the appellant was unable to provide a stable and clean environment for her other children; that her visits with Jacob were irregular; and that her progress in obtaining the medical training for caring for Jacob was slow. The caseworkers and guardian ad litem involved in the case all opined that the appellant did not have the ability to provide Jacob's most basic needs let alone his special medical needs due to his physical condition. Therefore, along with an extension pursuant to R.C. 2151.41.4 (D) (1) not being appropriate, it also does not appear that it is possible to provide Jacob a legally secure permanent home without permanent placement with Family Services pursuant to R.C. 2151.41.4 (D) (4). All of these factors are not outweighed by the fact that Jacob appears to remember and love his mother and brothers. If appellant cannot provide care for him after three and one-half years, and he is not eligible for any further extensions of temporary custody or long-term foster care, the only practical alternative to protect Jacob's best interests is by an award of permanent custody.
Assignment of Error III is overruled.
 IV. THE JUVENILE COURT COMMITTED REVERSIBLE ERROR WHEN IT ACCEPTED THE GUARDIAN AD LITEM'S REPORT EIGHTEEN DAYS AFTER THE CONCLUSION OF THE FINAL HEARING.
Appellant asserts in her fourth assignment of error that the Juvenile Court committed reversible error because the guardian ad litem submitted her report to the Juvenile Court after the adjudicatory hearing. Appellant failed to raise this issue at the trial court level and as such, waived any such error.
The Juvenile Court heard evidence on November 5, 1998 regarding the motion to modify temporary custody to permanent custody filed by Family Services. At the conclusion of the testimony, the court asked the guardian ad litem for her recommendation. After her oral recommendation that permanent custody of Jacob be granted to Family Services, the court asked specifically if the written report had been submitted. The guardian ad litem stated that it had not yet been submitted, but would be within a few days. Appellant made no objection to the delay.
We have held previously that the failure of a guardian ad litem to adhere to the requirement of R.C. 2151.41.4 (C) is waived unless raised at the trial court level. See In re Cordell (April 2, 1992), Cuyahoga App. Nos. 60049/60050, unreported (an award of permanent custody will not be disturbed "where the guardian ad litem failed to issue a written report" and "no objection was offered at the hearing"). See, also, In re Keltner (Aug. 10, 1998), Butler App. No. CA 97-10-188, unreported; In re Malone
(May 11, 1994), Scioto App. No. 93CA2165, unreported.
In the present case, appellant's trial counsel never objected to the hearing proceeding without the written report of the guardian ad litem and never requested the right after the report was submitted to question the guardian ad litem or challenge her report. Appellant's counsel also failed to object at the conclusion of the testimony when the court explicitly addressed this issue on the record. Accordingly, any error based upon the failure of the guardian ad litem to timely submit her written report has been waived.
In any event, there was ample evidence within the report to support the trial court's award of permanent custody making the late submission thereof harmless error. Appellate courts have used a harmless error analysis in reviewing cases in which the guardian ad litem failed to submit a report prior to the hearing. Those cases consider whether the guardian ad litem's failure to strictly comply with the statutory requirements have led to prejudice to the appellant. In re Malone, supra, at 11, citing Inre Searcy (March 26, 1992), Cuyahoga App. No. 59953, unreported. The evidence presented was substantial that appellant demonstrated a lack of commitment toward the child and an unwillingness to provide him with an adequate permanent home. Appellant has demonstrated no prejudice as a result of the guardian ad litem's failure to submit her report until after the hearing had concluded.
Assignment of Error IV is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas, Juvenile Court Division to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
O'DONNELL, P.J., and ROCCO, J., CONCUR
 _________________________________ JAMES M. PORTER JUDGE